Case No. 25-60209

---

UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT

---

Robert Walters,
Plaintiff – Appellant

v.

City of Byram,
Defendant – Appellee

---

On appeal from the United States District Court for the Southern
District of Mississippi Northern Division (USDC No. 3:23-cv-79)

---

**Original brief of appellant Robert Walters**

---

Respectfully submitted:

**THE LAW OFFICE OF
KEVIN S. VOGELTANZ, LLC**
Kevin S. Vogeltanz (Bar #32746)
428 W. 21st Ave. / Covington, LA 70433
Office: (504) 275-5149
Fax: (504) 910-1704
Email: vogeltanz@gmail.com
*Attorney for Plaintiff-Appellant
Robert Walters*

# I.    Certificate of Interested Persons

(1)    25-60209, *Walters v. City of Byram*
      USDC No. 3:23-cv-79

(2)    The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

    1.    Robert Walters, plaintiff/appellant

    2.    City of Byram, Mississippi, defendant/appellee

    3.    Kevin S. Vogeltanz, Esq.
        Law Office of Kevin S. Vogeltanz, LLC
        Attorney for Plaintiff/Appellant Robert Walters

    4.    Todd Butler, Esq.
        Loden Walker, Esq.
        Phelps Dunbar LLP
        Attorneys for Defendant/Appellee City of Byram

                    Respectfully submitted:

                    /s/ Kevin S. Vogeltanz
                    Kevin S. Vogeltanz (Bar #32746)
                    428 W. 21st Ave. / Covington, LA 70433
                    Office: (504) 275-5149
                    Fax: (504) 910-1704
                    Email: vogeltanz@gmail.com
                    *Attorney for Plaintiff-Appellant*
                    *Robert Walters*

## II.    Request for oral argument

Appellant Robert Walters respectfully requests oral argument. This case involves nuanced questions of fact and law concerning plaintiff's claims of religious discrimination and failure-to-accommodate liability under Title VII and the Mississippi Religious Freedom Restoration Act. Oral argument seems particularly well suited to discuss these issues.

# III.   Table of Contents

I.      Certificate of interested persons ........................................................ i

II.     Request for oral argument ................................................................ ii

III.    Table of Contents .......................................................................... iii

IV.     Table of Authorities ....................................................................... v

V.      Jurisdictional Statement ................................................................. 1

VI.     Statement of the Issues .................................................................. 2

VII.    Statement of the Case .................................................................... 3

        A.      The facts in a nutshell ........................................................ 3

        B.      The specifics of the vaccination-or-testing and reasonable
                accommodation dispute ........................................................ 5

        C.      Procedural history ............................................................ 14

        D.      The parties' arguments to the district court ........................... 15

        E.      Judge Wingate's reasons dismissing Walters's case ............ 23

VIII.   Summary of the Argument ............................................................. 29

IX.     Argument ....................................................................................... 32

        A.      *De novo* review applies .................................................... 32

        B.      The district court erred by dismissing Walters's complaints
                under Rule 12(b)(6) because his allegations plausibly
                suggested religious discrimination under Title VII and the
                MRFRA ............................................................................ 33

1. Walters plausibly alleged he was fired because of religious animus............................................................ 34

2. Walters plausibly alleged a biased vaccination and accommodation policy ................................................... 40

3. Walters plausibly alleged Green failed to offer him any reasonable accommodation for his religious belief ..... 46

4. Walters plausibly alleged violation of the Mississippi Religious Freedom Restoration Act ............................ 55

C. The district court erred by dismissing Walters's claims under Rule 56 because material disputes pervade the record and because Walters appropriately requested leave to conduct basic discovery under Rule 56(d)......................................... 61

X. Conclusion ..................................................................... 68

Certificate of Service ................................................................ 69

Certificate of Compliance ......................................................... 70

# IV.   Table of Authorities

## <u>Cases</u>

*Ansonia Bd. of Educ. v. Philbrook*,
　　497 U.S. 60 (1986) ............................................................ 47

*Brown v. Wal-Mart Stores E., L.P.*,
　　969 F.3d 571 (5th Cir. 2020) .......................................... 32

*Bruff v. N. Miss. Health Servs., Inc.*,
　　244 F.3d 495 (5th Cir. 2001) ...................................... 27, 49

Cicalese v. Univ. of Texas Med. Branch,
　　924 F.3d 762 (5th Cir. 2019) ...................................... 29, 34

*Clark v. Amoco Prod. Co.*,
　　794 F.2d 967 (5th Cir. 1986) .......................................... 42

*Davis v. Fort Bend Cty.*,
　　765 F.3d 480 (5th Cir. 2014) .......................................... 47

*Desert Palace, Inc. v. Costa*,
　　539 U.S. 90 (2003) ............................................................ 65

*E.E.O.C. v. Universal Mfg. Corp.*,
　　914 F.2d 71 (5th Cir. 1990) ............................................ 48

Groff v. DeJoy*,
　　600 U.S. 447 (2023) .......................................... 30, 47, 48

*Haire v. Bd. Of Sup'rs of La. State Univ. Agric. & Mech. Coll.*,
　　719 F.3d 356 (5th Circ. 2013) ........................................ 18

*Harville v. City of Houston, Miss.*,
　　945 F.3d 870 (5th Cir. 2019) .......................................... 38

*Hinojosa v. Johnson*,
　　277 Fed.Appx. 370 (5th Cir. 2008) ............................ 31, 68

*Horvath v. City of Leander,*
    946 F.3d 787 (5th Cir. 2020) ............................................... 16, 46, 54

*In re Katrina Canal Breaches Litig.,*
    495 F.3d 191, 205 (5th Cir. 2007) .................................................... 32

*Int'l Brotherhood of Teamsters v. United States,*
    431 U.S. 324 (1977) ........................................................................ 40

*Klassen v. Trustees of Indiana Univ.,*
    217 F.4th 592 (7th Cir. 2021) ........................................................ 44

*Littlejohn v. Shell Oil Co.,*
    483 F.2d 1140 (5th Cir. 1973) ........................................................ 67

*McLin v. Twenty-First Judicial Dist.,*
    79 F.4th 411 (5th Cir. 2023) .......................................................... 34

Raj v. Louisiana State Univ.*,*
    714 F.3d 322 (5th Cir. 2013) .................................................... 29, 34

*Ramming v. United States,*
    281 F.3d 158, 161 (5th Cir. 2001) .................................................. 32

Reeves v. Sanderson Plumbing Prods., Inc.,
    530 U.S. 133 (2000) ................................................................ 30, 33

*Sambrano v. United Airlines, Inc.,*
    21-11159, 2022 WL 486610 (5th Cir. Feb. 17, 2022) ..................... 45

*See Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.,*
    778 F.3d 473 (5th Cir. 2015) .......................................................... 35

*Simmons v. Pac. Bells, L.L.C.,*
    787 Fed. Appx. 837 (5th Cir. 2019) ........................................... 33, 64

*Staub v. Proctor Hosp.,*
    562 U.S. 411 (2011) ................................................................ 29, 36

*Stout v. Baxter Healthcare Corp.,*
    282 F.3d 856 (5th Cir. 2002) .......................................................... 40

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002) ........................................................................ 34

*Tanzin v. Tanvir*,
    592 U.S. 43 (2020) ................................................................... 31, 57

*Ticknor v. Rouse's Enterprises, LLC*,
    2 F.Supp.3d 882 (E.D. La. 2014) ....................................................... 67

*Together Employees v. Mass General Brigham Inc.*,
    32 F.4th 82 (1st Cir. 2022) ............................................................... 45

*Tunica Cnty. V. Gray*,
    13 So.3d 826 (Miss. 2009) ................................................................ 59

*U.S. Enercorp, Ltd. v. SDC Montana Bakken Expl., LLC*,
    966 F.Supp.2d 690 (W.D. Tex. 2013) ................................................. 42

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013) ........................................................................ 65

*Waste Mgmt. of Louisiana, L.L.C. v. River Birch, Inc.*,
    920 F.3d 958 (5th Cir. 2019) ........................................................... 33

## <u>Statutes</u>

28 U.S.C. § 1746 .............................................................................. 22

42 U.S.C. § 2000e-2 .................................................................. 42, 46

42 U.S.C. § 2000e-5 ........................................................................ 65

Miss. Code Ann. § 11-46-1 ............................................................... 58

Miss. Code Ann. § 11-46-3 ............................................................... 58

Miss. Code Ann. § 11-46-5 ............................................................... 58

Miss. Code Ann. § 11-61-1 ...................................................... 55, 57, 59

Miss. Code Ann. §§ 11-46-11 ............................................................. 58, 59

Miss. Code Ann. 11-46-15 .......................................................... 58

## V.    Jurisdictional Statement

This is a Title VII religious discrimination and failure-to-accommodate case with supplemental state-law claims under the Mississippi Religious Freedom Restoration Act. Plaintiff Robert Walters timely exhausted his administrative remedies with the EEOC; timely filed his federal complaint; and on March 28, 2025 the district court granted the defendant's consolidated motion to dismiss under Rule 12(b)(6) and alternative motion for summary judgment under Rule 56. The district court entered its final judgment dismissing all of plaintiff's claims the same day. Walters then timely filed his notice of appeal on April 21, 2025 within 30 days of entry of final judgment. Accordingly, this Court has jurisdiction under 28 U.S.C. § 1291.

## VI.  Statement of the Issues

1.    Did the district court err when it dismissed Walters's Title VII disparate-treatment religious discrimination claim, disparate impact claim, and failure to accommodate claim under Fed. R. Civ. P. 12(b)(6)?

2.    Did the district court err when it dismissed Walters's Title VII claims under Fed. R. Civ. P. 56?

3.    Did the district court err when it dismissed Walters's analogous state law claims under Mississippi Religious Freedom Restoration Act?

# VII.  Statement of the Case

## A.    The facts in a nutshell

The plaintiff, Robert Walters, was employed by the City of Byram, Mississippi as one of its municipal firefighters. ROA.8.   The City maintains a municipal fire department (among various other city departments).  ROA.10.  The appointing authority for the fire department is its fire chief, in this case a man named Fred Green.  ROA.10.   During the COVID-19 pandemic, Green made a rule requiring all firefighters to be vaccinated against the virus that causes COVID-19.  ROA.10.  No other City of Byram department required vaccination – not even the Byram Police Department.  ROA.29.

Walters is a lifelong firefighter.  ROA.9.  He's also a Pentecostal Christian and subscribes to what he describes as a Christian worldview. ROA.9, 14, 15.  Walters believes the COVID-19 vaccine is spiritually evil and he cannot receive it into his body.  ROA.14.

In 2021, Walters was full-time employed as a firefighter for the Jackson-Medgar Wiley Evers International Airport. ROA.13.   Green needed a new firefighter and recruited Walters to come work for the City of Byram.  ROA.13.  During their negotiations, Walters told Green he had

a religious-based objection to receiving the COVID-19 vaccine and asked Green whether the Byram fire department required COVID-19 vaccination. Green said maybe in the future, but Walters would be permitted to request a religious exemption. ROA.13. Walters then asked Green if he would be required to submit to weekly testing if he was granted an exemption. ROA.13. Green said no, specifically texting Walters "Hay [sic] Robert we have not gotten anything in writing that says you have to be tested every week!!!" ROA.13. Based on these assurances, Walters quit his job at the airport and began working for the City of Byram on August 20, 2021. ROA.13-14.

The Court can probably guess what happened next. Green did impose a rule mandating all firefighters receive the COVID-19 vaccine effective September 30, 2021, and Green immediately conditioned Walters's request for religious exemption on submitting to weekly lab testing, at his own expense, in addition to various other requirements. ROA.12, 16. Weekly lab testing would have cost Walters about one-half of his yearly take-home salary and he literally couldn't afford to pay it. ROA.20-21. Walters told this to Green, the Byram mayor, and the Byram Board of Alderman as he dutifully exhausted the City's internal

grievance policy. ROA.20-21, 22-23. No City official ever deviated from Green's vaccination rule or weekly lab-testing requirement. ROA.22-23.

The City of Byram fired Walters on November 3, 2021 for failing to abide by Green's vaccination mandate or pay for weekly lab testing. ROA.23.

In other words, long story short, Walters quit his firefighting job at the Jackson airport to come work for the City of Byram, and then the City fired him less than three months later because of his religious objection to Green's vaccination mandate and inability to pay for weekly lab testing.

## B. The specifics of the vaccination-or-testing and reasonable accommodation dispute

The SARS-CoV-2 virus causes the COVID-19 illness in humans. ROA.10. The COVID-19 pandemic began in the United States in early 2020. ROA.10. On December 11, 2020, the U.S. Food and Drug Administration issued an Emergency Use Authorization for the first publicly available COVID-19 vaccination manufactured by Pfizer, Inc. ROA.11. As of June 1, 2021, the U.S. Centers for Disease Control reported that the COVID-19 "B.1.617.2 / 'Delta' variant" had become the dominant variant in the U.S. ROA.11. By July 30, 2021, the CDC

reported that people vaccinated against the SARS-CoV-2 virus could still transmit the virus to others. ROA.11.  By October 29, 2021, *The Lancet* medical journal reported that fully vaccinated individuals have "peak viral load similar to unvaccinated cases" and could "efficiently transmit infection in household settings, including to fully vaccinated contacts." ROA.11.

The Byram fire department was the only city department to ever impose a COVID-19 vaccine mandate. ROA.12-13.  Even so, Fire Chief Green didn't announce his mandate until shortly after Walters began work in August 2021, ROA.12, and Green's mandate didn't become effective until September 30, 2021. ROA.20.  For the nearly 18 months of the COVID-19 pandemic before that, Green permitted his firefighters to work unvaccinated. ROA.12.  They were only required to wear face coverings and perform temperature self-checks before work. ROA.12.

Per Green's rule, any firefighter who didn't receive a COVID-19 vaccine by September 30, 2021 would be terminated for cause. ROA.12. The Byram Board of Alderman later codified Green's rule effective September 30, 2021.  ROA.20. Walters officially requested exemption from Green's vaccination mandate on August 23, 2021. ROA.14.  Simply

put, Walters believes that good and evil exists; that he is religiously obligated to do good and is religiously prohibited from doing or submitting to evil; and Walters believes the COVID-19 vaccine is spiritually evil. ROA.14.  Walters held (and still holds today) the sincere religious belief that receiving the COVID-19 vaccine is a religiously prohibited and evil act. ROA.14.

Walters was the only firefighter who submitted a request for religious accommodation. ROA.14.  Walters submitted a letter in support from his religious congregation, the First Pentecostal Church in Jackson. ROA.14.

On September 1, 2021, Green met with Walters to discuss his religious objection. ROA.14-15.  Green rejected Walters's request because, in Green's opinion, the Pentecostal Church did not believe that vaccination was spiritually prohibited. ROA.15.  Green told Walters that if he were a different religion – Green specifically mentioned the Jehovah's Witnesses – then Green would have granted Walters's request for exemption. ROA.15.  Green also told Walters that he had spoken to Byram's city attorney, a man named John Scanlon, and Scanlon shared Green's view that Walters, as a self-described Pentacostal Christian, did

not qualify for religious accommodation. ROA.15.  Green concluded the meeting by telling Walters "you have two choices – either take the vaccine or be terminated." ROA.15.  Based on Green's tone, demeanor, and words, Walters left the meeting feeling that Green disdained him because of his particular religious beliefs. ROA.15.

Walters did not sleep on his rights, and he continued to ask for religious accommodation exempting him from taking the COVID-19 vaccine. ROA.15, 16, 19, 20-23.  Green met with Walters again on September 17, 2021 to discuss the matter. ROA.15.  During that meeting, for the first time ever, Green told Walters he would exempt him from Green's vaccination mandate if Walters submitting to weekly COVID-19 testing, at his own expense, from a medical facility. ROA.16.  Critically, Green didn't require anyone else at the Byram fire department to submit to weekly testing, only Walters. ROA.18.  This is despite the fact that, as of July 30, 2021, the CDC had reported that people vaccinated against COVID-19 could still contract and spread the virus to others. ROA.18.

Nor did Green offer Walters the option to take any of the FDA-approved at-home tests for a fraction of the cost. ROA.16, 17.  Walters had contacted a local medical testing facility and, at the time, learned

that his total cost to submit to weekly lab testing would be approximately $12,000 per year. ROA.20-21. Walters's gross firefighter salary was only $32,000 per year. ROA.20-21. Walters determined that submitting to weekly testing would cost him approximately one-half of his yearly take-home pay. ROA.120-21. Walters literally couldn't afford that. ROA.20-21.

During their September 17, 2021 meeting, Walters asked Green to reconsider his testing requirement or his vaccination requirement in general. ROA.16. Green refused. ROA.16. Given that Green had only announced his "lab testing only" requirement during their meeting, and further given that Green had never required any of his firefighters to ever submit to weekly lab testing during the prior 18 months of the pandemic, and further given that Green only imposed his testing requirement on Walters despite the federal government's newest reporting that vaccinated people could still contract and spread the virus to others, Walters suspected Green (and in consultation with Scanlon) invented the testing requirement as a poison pill to force Walters to withdraw his request for religious accommodation (or to simply resign). ROA.16. Green never offered Walters the ability to test at home using any FDA

approved over-the-counter testing kit, nor did Green explain why he required lab testing generally. ROA.16, 17.

Shortly after their meeting, Walters submitted to Green a six-page, personal essay further describing in detail his religious objection to Green's vaccination rule. ROA.19. Walters repeated his religious objection that he could not receive things into his body that he viewed as spiritually evil. ROA.19. Walters, who doesn't drink, smoke, or consume drugs, wrote "How can I obey God's commands if I drink, smoke, use drugs, or take the vaccine? I cannot." ROA.19. Walters concluded his essay by again asking to be exempted from Green's seemingly *ad hoc* vaccination rule. ROA.19.

On September 1, 2021, Green and Scanlon wrote a formal response to Walters's request for accommodation. ROA.19. The letter opined that the City of Byram hadn't yet decided whether to accept the sincerity of Walters's religious objection. ROA.19. Nevertheless, the letter repeated that Walters could forgo Green's vaccine rule if Walters agreed to submit to weekly lab testing at his own expense. ROA.19-20. But, again, Walters could not afford to pay for weekly testing on his $32,000 per year gross salary. ROA.20-21.

The City of Byram has a 3-step grievance procedure for city employees who wish to challenge departmental personnel actions. ROA.20.  Here, Walters completed Step 1 when he complained to Green. ROA.20.  Step 2 permitted Walters to complain to the Byram mayor. ROA.20.  Step 3 permitted Walters to complain to the Byram Board of Aldermen. ROA.20.  On September 23, 2021, Walters timely requested a Step 2 meeting with the mayor, a man named Richard White. ROA.20. The mayor, the city attorney, and a city human resources officer attended along with Walters. ROA.20.  Walters explicitly told the mayor he could not afford the lab-testing fees and so he had no ability to comply with Green's lab-testing rule. ROA.20-21.  Walters explained that Green's "accommodation" was in reality no accommodation at all. ROA.21.  The mayor asked what Walters proposed, and Walters said that he would follow Green's prior protocol of always wearing a face covering and performing temperature self-checks before coming to work. ROA.21. Although the group didn't discuss over-the-counter testing using at-home testing kits, Walters would have agreed to that proposal as well. ROA.21. The mayor concluded the meeting with no immediate decision. ROA.21.

On October 20, 2021, Mayor White wrote Walters a letter indicating he must either be vaccinated or begin weekly lab testing at his own expense by November 3, 2021. ROA.21.  If not, the mayor wrote Walters would be terminated. ROA.21.  Mayor White did suggest four local testing facilities that he suggested offered free COVID-19 testing. ROA.22. Walters followed up on the recommendations and learned two did not offer COVID-19 testing at all and the other two didn't offer free testing. ROA.22.

Walters timely requested Step 3 of the city grievance procedure. ROA.22.  Walters addressed the Byram Board of Aldermen at its October 28, 2021 public meeting. ROA.22.  Walters once again reiterated the nature of his religious objection. ROA.22.  He reiterated that Chief Green recruited based on the assertion that Walters wouldn't be required to undergo weekly COVID-19 testing. ROA.22.  Walters told the Board that Green first rejected his request for religious accommodation because Green didn't reckon the Pentecostal Church believed what Walters believed about the vaccine. ROA.22-23.  Walters reiterated that he literally could not afford to comply with Green's lab testing rule. ROA.23. The Board asked no questions during the hearing.  Instead, after Walters

presented his case, the Board recessed into a private executive session. ROA.23.   When they returned, they voted and unanimously denied Walters's grievance. ROA.23.   Five days later, consistent with the mayor's earlier letter, the City fired Walters because he had not received vaccination or begun weekly lab testing. ROA.23.

Later, the Board released formal findings of fact supporting its denial of Walter's grievance, which defendant submitted along with its summary judgment motion. ROA.23, 64.   The Board wrote that public safety warranted that firefighters be vaccinated given that firefighters often responded to medical emergencies involving elderly people or those with other health risks. ROA.66.   The Board similarly wrote that firefighters often sleep in bunk rooms at the fire station with other firefighters in the same room, and were required to be in close proximity to members of the public during service calls. ROA.66-67.   The Board wrote the same wasn't true for other Byram city employees, including Byram police officers. ROA.67.   The Board ultimately wrote that it had offered Walters a reasonable accommodation to his religious objection (weekly lab testing at his own expense), and so the Board denied Walters's grievance. ROA.67.

## C.    Procedural history

On February 18, 2022, Walters timely filed an EEOC Charge of Discrimination challenging his termination on the basis of his religion and the City's failure to reasonably accommodate his religious beliefs (Charge No. 423-2022-679). ROA.8.   On February 23, 2022, Walters timely amended his EEOC Charge. ROA.8.   On November 4, 2022, the U.S. Department of Justice Civil Rights Division issued Walters his notice of right to sue in the matter. ROA.9.   On January 31, 2023, Walters timely filed his federal complaint in the U.S. District Court for the Southern District of Mississippi. ROA.6.   The case was originally allotted to the Hon. Kristi Johnson, who then *sua sponte* recused herself, and the case was reallotted to the Hon. Henry T. Wingate. ROA.56.   Walters asserted four claims in the federal lawsuit: disparate-treatment discrimination under Title VII (ROA.26), disparate-impact discrimination under Title VII (ROA.24), failure-to-accommodate discrimination under Title VII (ROA.30), and identical claims under Mississippi's Religious Freedom Restoration Act ("MRFRA") (ROA.34).

On May 15, 2023, in lieu of answering, the City filed a motion to dismiss under Rule 12(b)(6) and, in the alternative, a motion for

summary judgment under Rule 56. ROA.108.[1]  Walters timely opposed the motions.  ROA.162-187.  The City filed a reply brief.  ROA.196-209. Per local rule, all discovery was stayed in the case pending resolution of the City's motions. ROA.155.  On March 28, 2025, Judge Wingate granted the City's motion under both Rule 12(b)(6) and Rule 56 ("Ultimately, whether viewed through the lens of the pleadings, or the fuller summary judgment record, the outcome is the same: the City prevails on all claims").  ROA.210-233, 222.  Judge Wingate issued a written judgment dismissing Walters's case with prejudice the same day. ROA.234.  On April 21, 2025, Walters timely filed his notice of appeal in the matter seeking review of the district court's March 28, 2025 final judgment of dismissal.  ROA.235-236.

## D.    The parties' arguments to the district court

The City of Byram filed a motion to dismiss under Rule 12(b)(6) arguing that Walters's allegations, even if true, were insufficient to state a claim under either Title VII or MRFRA.  ROA.108.  The City also

---

[1] Defendant filed two identical (or nearly identical) motions to dismiss or alternatively motions for summary judgment *Compare* ROA.61-107 (district court Rec. No. 9 and 10) *with* ROA.108-154 (district court Rec. No. 11-12).  In its written order and reasons, the district court referred to defendant's motion and supporting memo found at ROA.108-154 (district court Rec. No. 11-12).  For consistency's sake, appellant cites to those documents here as well.

attached its Board of Aldermen "Findings of Fact" and several exhibits the Board attached to its writing as the City's Exhibit A. ROA.111-139. To the extent the City couldn't prevail under Rule 12, the City asked the district court to rule in its favor on summary judgment after considering the facts contained in the Board of Aldermen findings and exhibits. ROA.108.

The City argued several reasons for dismissal. Factually, first, the City argued that the Board of Aldermen was the "decisionmaker" who effectively fired Walters because it denied his grievance, ROA.143-144, and the City argued that although Walters alleged facts that might suggest religious animus from Green, Scanlon, or White, Walters failed to allege any facts plausibly attributing malice to the Board. ROA.144.

Legally, the City argued that case law supported its position, including that this Court in *Horvath v. City of Leander*, 946 F.3d 787 (5th Cir. 2020) found that a fire department's flu vaccine requirement and proposed accommodations were reasonable in a pre-COVID-19 case. ROA.144. The City also cited (without quotation) to the EEOC's guidance remarking on the undue hardship analysis, *see* ROA.145, but that EEOC guidance actually provides that an employer's proposed accommodation

is **not** "reasonable" if it results in a reduction in pay or benefits, which was the case for Walters given Green's requirement that he submit to weekly lab testing at his own expense at the total cost of about half his yearly take home salary:

> However, an employer's proposed accommodation will not be "reasonable" if the accommodation requires the employee to accept a reduction in pay or some other loss of a benefit or privilege of employment (for example, if unpaid leave is the employer's proposed accommodation) and there is a reasonable alternative accommodation that does not require that and would not impose undue hardship on the employer's business.

*See* EEOC, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, Section L.5., https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (last accessed July 20, 2025).

The City also argued that Walters could not prevail under Mississippi's Religious Freedom Restoration Act because MRFRA didn't provide a right of action for money damages (ROA.146); because Walters didn't satisfy the procedural requirements to bring his claim under the Mississippi Tort Claims Act (ROA.145-148); and because the City's vaccination rule applied to Walters didn't "substantially burden" his religious exercise (ROA.149-152).

17

Walters timely submitted an opposition brief that offered counterargument on each of these points. ROA.162-187. Under a Rule 12 analysis, Walters argued he pled facts that, when taken as true, plausibly suggested Green, Scanlon, White, and the Board held religious animus against him because they regarded his religious beliefs as fringe or unworthy of protection. ROA.168-169. But even if Walters's allegations didn't plausibly suggest individualized animus by the Board, a Title VII plaintiff is allowed to prove his case under a cat's paw theory, citing both to this Court's decision in *Haire v. Bd. Of Sup'rs of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356 (5th Circ. 2013) and this Court's pattern civil jury instruction 11.7 (2020). ROA.169-170. Walters argued that neither Mayor White nor the Board of Aldermen ever deviated from the rule that Green originally devised against Walters or conducted its own independent investigation, and Green's own statements evinced religious animus against Walters. ROA.170.

Likewise, under a Rule 12 analysis, Walters argued that he plausibly alleged disparate-impact discrimination given that Green's "lab testing" rule only applied to objectors like Walters. ROA.170-171. In the context of the U.S. government's public health reporting at the time that

18

even vaccinated Americans could contract and spread the so-called "Delta" variant, Walters argued that all firefighters – even vaccinated firefighters – should have been required to submit to weekly testing at their own expense, not simply those who made religious objections to Green's policy. ROA.171.

Finally, under Rule 12, Walters argued that Green's lab-testing rule offered no accommodation at all because Walters wasn't able to financially comply even if he had wanted to. ROA.173.  Walters first cited to this Court's decision in *Davis v. Fort Bend Cty.*, 765 F.3d 480 (5th Cir. 2014) for the proposition that the City bears the burden of proof to show its proposed accommodation was reasonable under the circumstances, ROA.172, and Walters also noted that the Supreme Court had recently heard oral arguments in *Groff v. DeJoy*, 600 U.S. 447 (2023) and appeared set to reject the so-called "de minimus burden" rule in Title VII reasonable accommodation cases (but had not rendered its ruling yet). ROA.172.  Walters also distinguished his case from the cases the City proffered in its support.  ROA.173-175.  This Court's decision in *Horvath* was particularly unhelpful to the City, because in *Horvath* the municipal fire department proposed an accommodation in lieu of the flu vaccination

that would have allowed the firefighter to transfer to a different job with the department, with identical pay and benefits, and with paid training. ROA.174. Those are more or less the opposite of what the City offered Walters in this case.

Next, Walters argued that the City's defense was unsupportable under a Rule 56 summary judgment analysis for three reasons: The Board of Aldermen findings proffered by the City weren't admissible under Rule 56 (ROA.183-184); even if they were material, disputes pervaded the case (ROA.184-185); and in any event Walters asked to at least stay the district court's decision so that he could conduct specifically identified discovery, including taking the depositions of Green, White, and at least one or more of the Board of Aldermen (ROA.162, 185-186).

Concerning the City's proffered evidence, Walters objected under Rule 56(c)(2) because the findings of fact were simply a collection of unsigned, out of court hearsay statements from unknown witnesses inadmissible in their present format. ROA.183-184. To the extent the findings were by Green, Scanlon, or White, Walters argued those witnesses appeared to be "interested witnesses" under the Supreme Court's rule in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S.

133 (2000) that couldn't be fully credited against Walters on summary judgment. ROA.182-183, 184).

Even so, Walters argued that whether Green held animus against him because of his religious beliefs; whether Green and others used the Board of Aldermen as their cat's paw; and whether Green's rule requiring Walters to submit to weekly testing at his own expense was reasonable or not under the circumstances were still factually disputed in the record. ROA.184-185.

Finally, Walters explicitly asked to stay the district court's decision under Rule 56(d) so that he could conduct specific discovery into these matters, including taking the depositions of Green, Scanlon, White, and at least one or more Aldermen to support Walters's verified allegations and impeach the conclusions set out in the Board's findings of fact. ROA.162, 185-186. Walters also asked for a reasonable opportunity to propound written discovery and to develop expert public health testimony regarding the reasonableness of Green's testing rule and the existence of other, bona fide reasonable accommodations the City failed to offer. ROA.186. Walters's attorney declared under penalty of perjury

his assessment these items were needed to properly rebut the City's dispositive motion under both Rule 56(d) and 28 U.S.C. § 1746. ROA.186.

Lastly, Walters rebutted the City's argument concerning the MRFRA. Walters pointed out that each of the cases cited in support of the City's arguments was decided before MRFRA was enacted. ROA.180-181. Walters pointed out that a claim under MRFRA was not subject to the Mississippi Tort Claims Act pursuant to the clear text of the statutes. ROA.180-181. Walters argued that the Supreme Court had already held that money damages were recoverable under the same federal legislation that MRFRA was modeled after, the Religious Freedom Restoration Act. ROA.181-182.

The City filed a reply brief arguing on these points. ROA.196-209. The only "new" argument was that, between the time that Walters filed his opposition and the City filed its reply, the Supreme Court decided the *Groff* case, rejecting the concept of a "de minimus" burden in Title VII reasonable accommodation cases, and instead holding that an employer who fails to offer a reasonable accommodation must prove that any accommodation presented a "hardship" which was "substantial in the overall context of [the] employer's business." ROA.201. *See also Groff,*

143 S.Ct. at 2294. The City argued that because it offered what it construed as a "reasonable accommodation" to Walters, it has satisfied its duty under Title VII and *Groff* simply didn't apply. ROA.202.

## E. Judge Wingate's reasons dismissing Walters's case

Judge Wingate issued his orders and reasons on March 28, 2025. ROA.210-233. The district court found in favor of the City and dismissed all of Walters's claims with prejudice. ROA.234.

First, Judge Wingate appears to have taken judicial notice of what the court described as the "historical context" of the COVID-19 pandemic both nationally and in Mississippi. ROA.211-213. Judge Wingate found that the City adopted Green's mandatory vaccination rule for purposes of public safety and for the reasons stated in the Board of Aldermen's findings of facts. ROA.212-213. Judge Wingate found that the City's policy was "a reflection of prevailing scientific consensus" and "a direct response to the legal and ethical obligations of municipal leadership" in the context of the pandemic. ROA.213.

Next, Judge Wingate opined that the City's motion to dismiss Walters's claims prevailed under either Rule 12(b)(6) or Rule 56. ROA.219. Judge Wingate specifically noted that "No party requested

additional discovery under Rule 56(d) and the Court finds that the factual record, including Walters's verified complaint and the exhibits submitted by the City sufficiently presents the core argument for both sides." ROA.219. Of course, Walters *did* specifically ask for discovery under Rule 56(d), noting precisely the discovery he sought and why, and including his attorney's signed declaration on these points. ROA.162, 185-186. Indeed, plaintiff's request for discovery was contained in the first paragraph of his opposition brief. ROA.162.

Concerning Walters's claim of Title VII disparate-treatment discrimination, the district court found that Green "recommended Walters's termination and that he was a central figure in the lead-up to the Board's vote." ROA.224. Nevertheless, the district court dismissed Walters's claim because "the record . . . contains no evidence that any member of the Board of Aldermen harbored anti-Pentecostal, or anti-religious, animus." ROA.224. Judge Wingate noted that the "only insight into the Board's reasoning comes from their written findings, which reflect a concern about health and safety, not religion." ROA.224. Judge Wingate cited to this Court's decision in *Harville v. City of Houston, Miss.*, 945 F.3d 870 (5th Cir. 2019) and found that "the motives of lower

24

level officials such as the Fire Chief or City Attorney are 'irrelevant and inconsequential,' unless their biases can be imputed to the final decision-makers." ROA.224.  Judge Wingate found that the Board offered to let Walters submit to weekly lab testing in lieu of vaccination, and this offer was further evidence of the Board's non-animus towards him.  ROA.224-225.

Concerning cat's paw liability, Judge Wingate also determined that Green's prior, prejudicial statements to Walters were **"*direct evidence*** that Green had at least some discriminatory outlook – he explicitly favored one religion (Jehovah's Witness) over Walters's religion in deciding who deserved accommodation." ROA.225.  Judge Wingate also found that Green and the city attorney (Scanlon) "presented the case to the Board and recommended termination." ROA.226.

Notwithstanding this finding of direct evidence of Green's discriminatory intent and his involvement in the City's termination decision, Judge Wingate concluded that, based on the "summary judgment record," Walters brought forward no evidence that "Chief Green's bias *proximately cause[d]* the Board's termination decision" (emphasis in original).  ROA.225.  Judge Wingate's decision was rooted

in the fact that "Walters himself was allowed to address the Board and explain his position," which the district court believed "mitigat[ed] the risk that the Board blindly accepted Chief Green's narrative." ROA.226.

Finding no direct evidence of animus from the Board itself, and insufficient summary judgment evidence of cat's paw liability, Judge Wingate appears to have analyzed Walters's disparate treatment claim under the *McDonnell Douglas* burden-shifting framework, and the district court determined that Walters brought forward no evidence of "pretext" indicating that the City's proffered health-motivated concerns were a sham. ROA.226-228. Judge Wingate concluded by writing "In sum, Walters's disparate treatment claim cannot survive. His allegations, taken as true, show that one of his supervisors, Chief Green, demonstrated insensitivity and even discriminatory bias toward Walters's religious stance; however, under Title VII, the City is liable only if that bias was connected to the termination decision." ROA.228.

Concerning Walters's disparate impact claim, Judge Wingate dismissed the claim primarily because Walters provided no "statistical evidence" showing that religious employees were disproportionately affected by the City's policy, ROA.229, and so Walters's "claim amounts

to a personal grievance, not a cognizable class-wide claim." ROA.229.

Judge Wingate also cited to other federal appellate pre-*Groff* decisions

upholding other COVID-19 vaccination policies. ROA.230. Judge

Wingate concluded that Green's policy satisfied the "business necessity

standard." ROA.230.

Concerning failure to accommodate liability, the district court noted

the Supreme Court's decision in *Groff*, but principally rooted its decision

in this Court's 2001 case in *Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d

495 (5th Cir. 2001), which stands for the proposition that an employer is

only required to offer a reasonable accommodation, not necessarily the

reasonable accommodation the employee prefers. ROA.230. The district

court noted that other cases had endorsed "mask-and-testing protocols"

as "reasonable accommodations." ROA.231. Judge Wingate again cited

to this Court's decision in *Horvath* for the proposition that a municipality

may require its firefighters to submit to vaccination assuming a

reasonable accommodation is offered. ROA.231-232.

Finally, Judge Wingate dismissed Walters's identical state law

claims under the Mississippi Religious Freedom Restoration Act.

ROA.232. The district court found that MRFRA did not clearly grant

statutory authorization for money damages, ROA.232, and the district court rejected Walters's argument that the Mississippi legislature exempted MRFRA claims from the procedural requirements to bring other sorts of tort claims under the Mississippi Tort Claims Act. ROA.232-233.

Even so, Judge Wingate also concluded that Walters's claim failed on the merits because Judge Wingate determined that Green's vaccination rule and weekly lab-testing requirements both served a compelling governmental interest and that Walters "has not presented evidence that any less restrictive means would have equally satisfied the City's legitimate goals[.]" ROA.233.

## VIII. Summary of the Argument

The district court erred under both Rule 12(b)(6) and Rule 56.

At the pleading phase, Walters needed only to allege an adverse employment action taken because of his protected status. He did so. His complaint easily met the "ultimate-elements" test this Court reaffirmed in *Cicalese v. Univ. of Texas Med. Branch*, 924 F.3d 762 (5th Cir. 2019) and *Raj v. Louisiana State Univ.*, 714 F.3d 322 (5th Cir. 2013). The district court even determined that Fire Chief Green's comments that he would accommodate a "Jehovah's Witness" but not a Pentecostal like Walters was direct evidence of religious bias.

Under *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011), such bias is imputed to the City when, as here, the biased supervisor set the termination in motion and the Board of Aldermen approved the discriminatory act. The district court erred by when it required Walters to plead individual animus against the entire Board. Even so, Walters's allegations plausibly suggested the Board did hold the same sort of animus against Walters as did Green and his fellow city administrators.

The district court likewise erred when it dismissed Walters's disparate-impact and accommodation claims. Concerning disparate

impact, Green's "vaccinate-or-pay-for-weekly-lab-tests" rule burdened only religious objectors like Walters, and Walters's allegations plausibly undermined the City's business necessity defense. Concerning reasonable accommodation, the district court erred when it found Green's proposed accommodation "reasonable" even though Walters alleged he literally could not afford to comply with the rule even if had wanted to. Because Green's proposal was the inevitable and functional equivalent of simply firing Walters because of his religious belief, the City was required to prove that all other reasonable accommodations would have caused it a "substantial" and undue hardship in the overall context of the City's business. *Groff v. DeJoy*, 600 U.S. 447 (2023).

Summary judgment was likewise improper. The court credited the City's unsworn "findings of fact" to dismiss Walter's claims, which were filled to the brim with otherwise inadmissible hearsay, statements from unidentified declarants, and at best the perspectives of interested officials, all while diminishing Walters's verified complaint – an approach forbidden by *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). At minimum, Walters was entitled to conduct at least ***some*** specific and outcome-determinative discovery, which Walters timely and

appropriately requested before the entry of summary judgment under Rule 56(d), including depositions and written discovery from the key witnesses in the case. When a non-movant timely and for specific reasons requests time to complete necessary discovery, a district court's denial of discovery and grant of summary judgment is reversible error. *Hinojosa v. Johnson*, 277 Fed.Appx. 370, 378 (5th Cir. 2008)

Finally, the court erred when it dismissed Walters's state law claims under the Mississippi Religious Freedom Restoration Act ("MRFRA"). The U.S. Supreme Court has previously held identical language found in the federal Religious Freedom Restoration Act authorized an award of money damages, *see Tanzin v. Tanvir*, 592 U.S. 43, 51 (2020), and the district court gave no statutory or case law reason distinguishing the identical language found in RFRA and the MRFRA.

The court also erred when it determined claims under MRFRA must be brought under the Mississippi Tort Claims Act ("MTCA"). They don't. The Mississippi legislature provided a clear waiver of sovereign immunity in the text of the MRFRA, independent of the waiver contained in the MTCA, and the text of the MTCA make clear that it only applies to claims arising under the act, which  claims under the MRFRA do not.

## IX.   Argument

### A.   *De novo* review applies

The district court dismissed all of plaintiff's claims under both Rule 12(b)(6) and Rule 56.   Under either standard, this Court reviews the dismissal *de novo*.

Under Rule 12(b)(6), this Court reviews the district court's order *de novo*, applying the same standard applicable to the district court. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (so holding). Under Rule 12, the "court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotations omitted).

Under Rule 56, this Court reviews the "grant of summary judgment *de novo*, applying the same legal standards as the district court." *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 576 (5th Cir. 2020), as revised (Aug. 14, 2020).   Summary judgment is only appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "All evidence is viewed in the light most favorable to the nonmoving

party." *Brown*, 969 F.3d at 576. The court must not make credibility determinations. *Waste Mgmt. of Louisiana, L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019). The Court must not credit an interested witness's testimony against the non-movant on summary judgment. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (so holding); *Simmons v. Pacific Bells, L.L.C.*, 787 F. App'x 837, 840 (5th Cir. 2019) (defining "interested witness").

## B.   The district court erred by dismissing Walters's complaints under Rule 12(b)(6) because his allegations plausibly suggested religious discrimination under Title VII and the MRFRA

The district court didn't cleanly delineate its reasons for dismissal under Rule 12 versus Rule 56. Nevertheless, because a plaintiff's preliminary case should be easier to prove under Rule 12, plaintiff begins the discussion here first. If Walters didn't plead a plausible case of religious discrimination under Rule 12, then a Rule 56 analysis is probably irrelevant.

Under Rule 12(b)(6), the district court erred by dismissing Walters's claims because he did all that this Court required him to do at the preliminary stage of the case: (1) he alleged an adverse employment

action (2) because of facts plausibly suggesting discrimination. *See, e.g.*, *Cicalese v. Univ. of Texas Med. Branch*, 924 F.3d 762, 767 (5th Cir. 2019) ("We reiterate, however, that a court errs by requiring a plaintiff to plead something more than the 'ultimate elements' of a [discrimination] claim"); *Raj v. Louisiana State Univ.*, 714 F.3d 322, 331 (5th Cir. 2013) ("a plaintiff need not make out a *prima facie case* of discrimination in order to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim") (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-12 (2002)); *McLin v. Twenty-First Judicial Dist.*, 79 F.4th 411, 417 (5th Cir. 2023) ("A complaint need not allege 'each prong of the prima facie test for disparate treatment' in order to overcome a Rule 12(b)(6) motion; rather, to support a disparate treatment claim under Title VII, a complaint must plausibly set out facts that the 'defendant took the adverse employment action against a plaintiff because of her protected status").

### 1.    Walters plausibly alleged he was fired because of religious animus

The district court correctly determined that Green's comments to Walters during their first meeting on September 1, 2021 "smacks of religious bias[,]" ROA.228, and qualified as "direct evidence" of "at least some discriminatory outlook." ROA.225.  Direct evidence is evidence that

proves discriminatory intent "was *a* basis in employment decisions" without further inquiry. *See Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C.*, 778 F.3d 473, 476 (5th Cir. 2015) (emphasis in original).

Here, Green told Walters he didn't believe the Pentecostal faith forbade vaccination, and Green would have excused Walters from Green's vaccination requirement altogether – apparently without any need for weekly lab testing – if Walters were a Jehovah's Witness rather than a Pentecostal Christian.  ROA.15.  In the context of what we're discussing on appeal here – whether Walters deserved a religious accommodation based on his faith – Green's comments reveal his bias played at least "a basis" in his decision to first deny Walters's request, and later to accommodate the request only if Walters accepted the impossible condition of paying for weekly lab testing at his own expense.

The district court erred, however, as it analyzed this issue under a cat's paw theory – ultimately finding that Walters didn't sufficiently allege either bias by the Board of Aldermen or Green's influence over the Board – because this analysis sidesteps the threshold issue.  The Board of Aldermen didn't vote to "fire" Walters, the Board only voted to deny Walters's grievance concerning Green's prior denial of his religious

accommodation in the first place (Walters was then fired for his non-compliance with Green's rule). That nuance matters. The ***only reason*** Walters was before the Board in the first place was because Green – so the district court correctly found – had already directly discriminated against him because of his religion. Even if the Board believed, free of animus, that Green's lab-testing accommodation was "reasonable," it voted to sustain what the district court had already determined to be a religiously-motivated adverse action.

The Supreme Court in *Staub v. Proctor Hosp.* held that a final decisionmaker's exercise of judgment does not "automatically render[] the link to the supervisor's bias 'remote' or 'purely contingent.'" *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011). This is because although the final decisionmaker's judgment is "*also* a proximate because of the employment decision . . . it is common for injuries to have multiple proximate causes." *Id.* at 420 (emphasis in original). In *Staub*, the Supreme Court explicitly rejected the notion that a decisionmaker's independent investigation of an employer's performance, which a supervisor had noted deficient for discriminatory reasons, necessarily absolved the employer of liability. *Id.* at 420-21. The Supreme Court

held "The employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment action." *Id.* at 421.

Under a Rule 12(b)(6) analysis, that's exactly what happened here. Walters properly alleged that Green rejected Walters's request for accommodation based on religious bias, and that same bias motivated Green (and as Walters alleged, Scanlon and White) to offer him the "poison pill" of weekly lab testing that they knew Walters couldn't afford. The district court correctly so found. But the district court erred by finding these allegations insufficient to make out a claim for disparate-treatment discrimination under Rule 12(b)(6).

Of course, Walters also alleged that the Board itself held animus against him, and that was likewise plausibly pled under Rule 12(b)(6). Walters alleged the Board asked him no questions during its hearing and then retired to a private, executive session likely attended by at least Scanlon and White, who had already and previously approved Green's discriminatory decisions. Walters plausibly (and realistically) alleged that the Board – which had no independent knowledge of these events – likely relied on the advice of those whom Walters already and plausibly

alleged held bias against him.  Yes, the Board *later* released findings of act *after it had already voted*, but those *post-hoc* explanations, at least in the Rule 12(b)(6) stage of the case, cannot trump Walters's well-pled allegations plausibly suggesting the existence of religious bias.

The district court's decision on this point seems rooted in this Court's decision in *Harville v. City of Houston, Miss.*, but such reliance is misplaced.  First, *Harville* was decided on summary judgment after what appears to have been a full discovery period, documents collected, and depositions taken of the relevant witnesses.  *Harville v. City of Houston, Miss.*, 945 F.3d 870, 877-878 (5th Cir. 2019).  That's of course not the case here, nor could it be in the context of Rule 12(b)(6).  Second, *Harville*'s conclusions – at least as argued by the City and as interpreted by the district court – seem at odds with the Supreme Court's earlier decision in *Staub*, calling into question *Harville*'s viability to the extent it conflicts with the Supreme Court's earlier pronouncements concerning the proximate cause of a supervisor's discriminatory intent on a later decisionmaker's adverse action.

Finally, *Harville* is distinguishable on its facts.  The defendant's argument in *Harville* was that it decided to eliminate four municipal jobs

during a reduction in force based on budgetary concerns, including the plaintiff's deputy clerk position. The plaintiff argued that one of the Aldermen wanted the plaintiff's job eliminated so that the city could later hire the Alderman's relative to fill the job. This Court found that the plaintiff produced insufficient discovery evidence on summary judgment that "a majority of the board had [the requisite] animus" against her. *Id.* at 878.

In the context of a Board's deliberation about which jobs should be cut, the *Harville* decision seems probably correct. But its facts are nothing like the allegations in this case, in which the City of Byram Board of Aldermen voted on Walters's grievance against what the district court already and correctly determined to be a discriminatory accommodation. Voting to sustain a discriminatory practice is, of course, plausible evidence of discriminatory intent. Likewise, in this case, the City of Byram's Aldermen were voting, essentially, to support their fire chief and mayor's prior decision-making rather than freshly deliberating Walters's original religious objection.

### 2. Walters plausibly alleged a biased vaccination and accommodation policy

The district court dismissed Walters's disparate impact claim by finding his allegations made out only a "personal grievance, not a cognizable class-wide claim," and that Green's rule nevertheless constituted a business necessity. ROA.229-230. These conclusions were error in the context of Rule 12(b)(6).

First, Walters admitted and alleged in his complaint that, to the best of his knowledge, he was the only firefighter who objected to Green's vaccination policy on religious grounds. The fact that an otherwise disparately impacting policy only burdens one person's religious belief does not transmogrify the policy from unlawful to lawful if the policy would similarly burden any other religious objectors.

"Disparate impact claims involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Stout v. Baxter Healthcare Corp.*, 282 F.3d 856, 860 (5th Cir. 2002), *citing Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15 (1977). This Court in *Stout* held that although a plaintiff will often prove a disparate impact claim using statistical

evidence, a plaintiff can still "prove a prima facie disparate impact case without statistical evidence." *Id.* at 860. The fact that Walters, at the moment he filed his complaint, before any discovery was allowed to take place, was without statistical evidence to support his claims is both unsurprising and irrelevant. Under this Court's decision in *Stout*, Walters wasn't required to put forward statistical evidence at this stage of the case in the first place.

Second, Walters's allegations more than plausibly state a disparate impact claim. Indeed, the district court more or less found that Green's policy was, in fact, disparately impacting. Under Green's policy, although stated as facially neutral, only certain religious objectors were entitled to accommodation based on Green's (and apparently Scanlon's) determination of which religions were opposed to vaccination or not. In other words, Green's policy that "all firefighters must be vaccinated absent accommodation" sounds facially neutral, but the policy disparately impacted religious objectors who grounded their decision in religious beliefs that Green (and Scanlon) viewed as fringe or otherwise unworthy of protection. Likewise, Green's "weekly lab testing" rule only impacted firefighters who objected to the vaccination rule based on

41

religious belief in the first place. But Walters alleged (and the district court so found in the portion of its opinion described as the pandemic's "historical context"), that the Delta variant was capable of infecting both vaccinated and unvaccinated people at the time Green imposed his lab-testing accommodation to Walters. ROA.11, 18, 211-212.

The district court's finding that Green's policy satisfied business necessity in the context of Rule 12(b)(6) was also in error. In Title VII disparate impact cases, the defendant bears the affirmative defense to prove business necessity. 42 U.S.C. § 2000e-2(k)(1)(A)(i). This Court has previously held a district court errs by granting a Rule 12(b)(6) motion to dismiss based on a defendant's purported affirmative defense unless, based "on the face of the pleadings . . . the viability of the affirmative defense [is] essentially . . . unquestionable." *U.S. Enercorp, Ltd. v. SDC Montana Bakken Expl., LLC*, 966 F.Supp.2d 690, 697 (W.D. Tex. 2013), *citing Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986). And, even if a defendant proves a business necessity, a Title VII plaintiff has the right to prove an alternative employment policy exists that satisfies the defendant's needs, but the defendant rejected the proposal. 42 U.S.C. § 2000e-2(k)(1)(A)(ii). All that seems applicable here.

First, Walters alleged that Green did not require his firefighters to submit to the COVID-19 vaccination for nearly the first 18 months of the pandemic all the way through September 30, 2021. ROA.12, 20. The district court found Green's decision to mandate vaccination was rooted in the upsurge in Delta-variant cases in the summer of 2021. ROA.212-213, 229-230. This calls into question the "business necessity" of Green's vaccination mandate, particularly given that Green's rule wasn't effective until September 30, 2021 – several months after the surge in Delta-variant cases.

Second, at the same time Green had promulgated his "vaccination-or-testing" rule, Walters alleged and the district court also found that U.S. public health entities reported vaccinated individuals were capable of both contracting and spreading the Delta variant to others. This is the real nail in the business-necessity coffin. Green's "weekly lab testing" rule only burdened religious objectors like Walters. But Green's rule made zero sense in the context of public health reporting at the time. If Green was actually worried that his firefighters might contract and spread the Delta variant to others both in the fire station and in the community, then the only rational rule would have been to require all

firefighters to weekly test at their own expense – vaccinated or not vaccinated, religious objector or not.  Green didn't do this, undercutting the idea that testing was a business necessity in the first place.  At the very least, in the context of Rule 12, Walters's allegations did not "plead himself out of court" by alleging all the elements of the City's affirmative defense.

Finally, as an alternative employment practice, Walters alleged that he offered to follow Green's prior protocol of wearing a face covering while at work and performing temperature self-checks at the beginning of every shift.  In the context of a Rule 12(b)(6) motion, this was sufficient to proffer Walters's alternative business practice sufficient to defeat dismissal pending fact-finding on the issue.

The district court did cite to three cases for the proposition that vaccination-or-testing rules were in the nature of a per se business necessity during the pandemic, ROA.230, but none are persuasive.  *Klassen v. Trustees of Indiana Univ.*, 217 F.4th 592 (7th Cir. 2021) is inapplicable on its face because the university-student plaintiffs challenged their university's vaccination-or-testing policy under the 14th Amendment's Due Process Clause and rational basis review, not under

Title VII or its disparate impact and business necessity provisions. *Id.*
at 593. *Klassen* is also inapplicable because it's unclear who had to pay
for the weekly testing – the university or the students (the opinion simply
doesn't say). The fact that Green required Walters to pay the lab testing
expense is of course why it was impossible for Walters to comply.

    *Together Employees v. Mass General Brigham Inc.*, 32 F.4th 82 (1st
Cir. 2022) is inapplicable because that case decided whether a group of
employees had alleged sufficient harms to win a preliminary injunction
against the employer's COVID-19 vaccination policies pending resolution
of the case on the merits. *Id.* at 84. That question simply isn't applicable
in Walters's case. In any event, *Together Employees* is doubly unhelpful
because the First Circuit reached the opposite conclusion of this Court in
its *Sambrano* case (granting preliminary injunction in favor of United
Airlines' pilots during the COVID-19 pandemic). *See id.* at 86 n.3 (citing
to *Sambrano v. United Airlines, Inc.*, 21-11159, 2022 WL 486610 at *9
(5th Cir. Feb. 17, 2022) ("United has presented plaintiffs with two
options: violate their religious convictions or lose all pay and benefits
indefinitely. That is an impossible choice for plaintiffs who want to
remain faithful but must put food on the table")).

Finally, the district court cited to this Court's decision in *Horvath v. City of Leander*, 946 F.3d 787 (5th Cir. 2020) which affirmed a municipal fire department's proposed accommodation to a firefighter who objected to receiving the TDAP vaccine because of his religious beliefs. *Id.* at 789. *Horvath* is really a case that supports Walters's failure-to-accommodate claim (*see infra*), but in any event is not helpful in the context of a disparate impact analysis because the plaintiff in *Horvath* never alleged disparate impact under Title VII (just disparate treatment), and this Court didn't analyze his case under a disparate impact framework.

### 3.     Walters plausibly alleged Green failed to offer him any reasonable accommodation for his religious belief

The district court erred when it found Green's "weekly lab testing" accommodation was reasonable as a matter of law. Under Rule 12, based on Walters's well-pled allegations, the policy was facially **un**reasonable because it didn't actually resolve the conflict between Walters's religious objection and Green's vaccination rule. Walters couldn't afford to lab-test weekly at his own expense, and Byram's city administrators all knew this, and so Green's "accommodation" was simply the inevitable, functional equivalent of firing Walters because of his religious belief.

Title VII doesn't permit an employer to offer no accommodation unless all accommodations would present an undue hardship, which the Supreme Court in *Groff v. DeJoy*, 600 U.S. 447 (2023) has clarified means a "substantial" hardship "in the overall context of an employer's business." *Id.* at 468.

To better inform the conversation, let's review the basic principles underlying a Title VII religious accommodation dispute:

First, Title VII requires employers to provide a reasonable accommodation to their employees that eliminates the conflict between religious belief and workplace policy – unless all possible accommodations would impose an undue hardship on the employer. *See Ansonia Bd. of Educ. v. Philbrook*, 497 U.S. 60, 70 (1986) (a "reasonable accommodation" under Title VII is one that "eliminates the conflict between employment requirements and religious practices").

Second, once a plaintiff proves he's informed his employer of his religious objection, the employer bears the affirmative defense to prove it either offered a "reasonable accommodation" to resolve the conflict or all possible accommodations would have constituted an "undue hardship" on the employer. *Davis v. Fort Bend Cty.*, 765 F.3d 480, 485 (5th Cir. 2014).

Third, the Supreme Court's recent decision in *Groff* (decided after plaintiff had already filed his opposition brief with the district court) teaches that an "undue hardship" means a "substantial" hardship," and substantiality must be determined "in the overall context of an employer's business." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023). The *Groff* Court surmised that "substantial" likely means "something closer to . . . substantial additional costs or substantial expenditures." *Id.* at 470 (internal quotations omitted). The *Groff* Court instructed district courts to "apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer." *Id.* at 470-471 (cleaned up).

Fourth, this Court has previously noted whether a Title VII religious accommodation is "reasonable" or not is a question of fact that must ordinarily be resolved by the fact-finder. *E.E.O.C. v. Universal Mfg. Corp.*, 914 F.2d 71 (5th Cir. 1990) ("We need not embark on a long discussion of what is or is not 'reasonable' accommodation. Ordinarily, questions of reasonableness are best left to the fact finder").

Fifth, in the context of Rule 12(b)(6), and as mentioned *supra*, a district court errs by granting an employer's affirmative defense unless "on the face of the pleadings . . . the viability of the affirmative defense [is] essentially . . . unquestionable." *U.S. Enercorp, Ltd.*, 966 F.Supp.2d at 697, *citing Clark*, 794 F.2d at 970. Here, that would mean Walters's allegations objectively and conclusively proved that Green's "lab-testing" accommodation was reasonable under the totality of circumstances as a matter of law. That's obviously not the case here.

With these principles in mind, the district court clearly erred under Rule 12(b)(6) when it dismissed Walters's reasonable accommodation claim. Walters alleged he held a sincere objection to Green's vaccination rule, and the district court correctly concluded Walters did sincerely hold the belief. ROA.232. The district court primarily rooted its conclusion that Green's lab-testing accommodation was reasonable based on this Court's decision in *Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495 (5th Cir. 2001). ROA.231.

The district court's reliance on *Bruff* was misplaced. This Court's conclusion in *Bruff* that the employer had offered its recalcitrant employee multiple reasonable accommodations was correct. But the facts

in *Bruff* are radically different from this case. *Bruff* involved an employer who earnestly attempted to comply with Title VII's requirements, and an employee who simply refused to accept multiple reasonable offers to accommodate her beliefs. That's the opposite of this case. *Bruff* is no bar to Walters's reasonable accommodation claim. If anything, *Bruff* supports Walters's position.

In *Bruff v. N. Miss. Health Servs, Inc.*, a mental health counselor employed by the local hospital was required, as part of her job responsibilities, to treat patients referred to the hospital under various healthcare contracts. Based on her religious objections, the counselor outright refused to treat patients who were gay or lesbian or who were otherwise struggling with romantic relationships outside of marriage. The *Bruff* panel described the counselor as outright objecting to "some aspects of the [counseling] position itself," *Bruff*, 244 F.3d at 500, and "apparently assumed she would only have to perform those aspects of the position she found acceptable." *Id.*

Here, the facts of *Bruff* already diverge from Walters's case. There is no allegation in this case that Walters ever objected to any of his job responsibilities. Just the opposite. All Walters ever requested was to

simply continue working as a firefighter while observing his religious beliefs.

Back to *Bruff*. The hospital offered the counselor multiple reasonable accommodations, all of which the employee rejected. First, management "met several times to determine if Bruff's request could be accommodated by shifting responsibilities among the three [other] counselors." *Id.* at 497. But there were only three counselors in the unit, one of whom was the supervisor, and the hospital found switching schedules based on specific patients wasn't feasible. *Id.* Management then offered to allow Bruff to transfer to a different unit within the counseling department "specifically performing pastoral or Christian counseling." Bruff refused because she believed her proposed supervisor would not approve of her "conservative" religious views. *Bruff* at 498.

Management then offered to let Bruff request a transfer to any other position "in which conflict of care issues were less likely to occur" and offered to assign its "in-house employment counselor . . . to assist Bruff in locating another position within the hospital system." *Id.* The hospital gave Bruff 30 days to find another position. During that time, the hospital's in-house counselor did find Bruff a "list of available

openings, and offered her the opportunity to take two tests designed to manifest her aptitudes and interests." But Bruff refused "to take the tests or to apply for any non-counselor position." *Id.* At the same time, "another counselor position became available" but again Bruff "chose not to apply." *Id.* at 499. After 30 days, and faced with an employee who both refused to do her job and refused to do anything at all to reach an alternative accommodation, the hospital finally terminated Bruff's employment.

Once again, the facts of *Bruff* are nothing like those in this case and are completely irrelevant to determining the reasonableness of Green's "weekly lab test at your own expense" policy. Unlike the counselor in *Bruff*, Walters never objected to performing any of his job responsibilities. Green never offered Walters any reassignment. The record is devoid of any allegation that Green offered to help Walters find another position within the fire department, nor did Green permit Walters to simply use FDA-approved over-the-counter tests to comply with Green's *ad hoc* decision, nor did Green allow Walters to simply observe the same safety protocols that Green had successfully instituted for the previous 18 months of the pandemic.

Summed up, the first fundamental difference between *Bruff* and this case is that, in *Bruff*, the employer made several bona fide attempts to accommodate its employee based on her religious objection – including offering Bruff a job transfer, restructured job responsibilities, and in-house help to find another position.  None of that happened in this case. The second fundamental difference is that compliance with Green's "weekly lab testing rule" was impossible for Walters to comply with because it would have cost him approximately $12,000 per year at prevailing rates, equal to half his yearly take-home pay.

While this Court in *Bruff* observed in a footnote that Bruff was offered transfers to positions that would have come with reduced pay, this Court nevertheless declined to find the proposed accommodation unreasonable on that point alone.  *Bruff*, 244 F.3d at 502 n. 23.  But the extent of Bruff's potential pay cut doesn't appear in the text of the decision, and in any event the *Bruff* court didn't indicate that the reduction in pay was so significant that the employee simply could not afford to comply, which is precisely the case here.

Moreover, here, Walters's plausibly alleged that Green's proposed "weekly lab testing at your own expense" rule was simply designed as a

poison pill to force his resignation or termination. The district court seems to also have regarded Green's "accommodation" in such a way, or at least plausibly so. None of that sort of direct evidence of animus was present in the *Bruff* case, and plaintiff seriously disputes whether a proposed accommodation devised with animus in mind could ever constitute a "reasonable" accommodation under law.

The district court also cited to this Court's decision in *Horvath v. City of Leander*, 946 F.3d 787 (5th Cir. 2020). *Horvath*, discussed *supra*, concerned a municipal fire department's efforts to accommodate a firefighter with a religious objection to the TDAP vaccine. *Horvath* isn't applicable to this case anymore than *Bruff*. The department in *Horvath* offered its employee the "opportunity to transfer to a code enforcement position that would not require him to receive vaccinations. The position offered the same salary and benefits as the driver/pump operator position." *Horvath*, 946 F.3d at 792. That's simply not the case here. Green's only accommodation was for Walters to comply with a rule that he could not financially afford to comply with. Green's proposed accommodation was the functional equivalent to no accommodation at all. And Green, the city attorney, the mayor, and the Board of Aldermen

all knew this because Walters told them this at each step of his grievance. None apparently cared or made any attempt to offer Walters any accommodation that he could actually comply with.

At bottom, under Rule 12(b)(6), Walters alleged he held a sincere objection to Green's vaccination rule; that he informed management of his decision; and that he was fired for his non-compliance. This is all Walters is required to allege under this Court's Title VII reasonable accommodation jurisprudence. *See Davis*, 765 F.3d at 485. The City in turn was obligated to prove as an affirmative defense that Green's "lab testing" policy was reasonable as a matter of law (which, in turn, must have included at least some proof that Walters could have financially afforded to comply). The City did not and could not so do under Rule 12(b)(6) based on Walters's well-pled allegations. The district court erred in dismissing Walters's failure to accommodate claim.

### 4.    Walters plausibly alleged violation of the Mississippi Religious Freedom Restoration Act

Walters likewise asserted analogous disparate treatment and failure to accommodate claims under the Mississippi Religious Freedom Restoration Act ("MRFRA") codified at Miss. Code Ann. § 11-61-1 *et seq.* ROA.34. The district court correctly noted that, under MRFRA, a

governmental entity may not "substantially burden" an employee's religious beliefs except upon proof of a "compelling governmental interest" and the "least restrictive means" of accomplishing the goal. ROA.232.  On brief to the district court, both plaintiff and defendant agreed that the MRFRA was modeled after the federal Religious Freedom Restoration Act and that federal RFRA jurisprudence should guide the court's interpretation of the MRFRA. ROA.149-150, 176-177.

The district court dismissed Walters's MRFRA claims.  The district court's decision was based on three errors: finding MRFRA did not authorize a money damages award against the City of Byram; finding claims under MRFRA must necessarily be brought under the Mississippi Tort Claim Act; and finding the City's actions nevertheless satisfied strict scrutiny review. ROA.232-233.  Plaintiff addresses each decision in turn.

First, concerning money damages, every case cited by defendant on this point to the district court below was decided *before* the MRFRA was enacted. *See* ROA.181 (discussing the cases).  Those cases are irrelevant. Next, the text of MRFRA is modeled after RFRA, including its recovery clause, which provides that "A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim

56

or defense in a judicial proceeding ***and obtain appropriate relief against the government***." Miss. Code Ann. § 11-61-1(6). This bolded language is identical to the recovery clause provided in RFRA. In 2020, the U.S. Supreme Court interpreted that exact phrase in RFRA to authorize an award of money damages *Tanzin v. Tanvir*, 592 U.S. 43, 51 (2020). ("A damages remedy is not just 'appropriate' relief as viewed through the lens of suits against Government employees. It is also the only form of relief that can remedy some RFRA violations"). On brief below, defendant argued that federal jurisprudence ought to guide the court's interpretation of MRFRA. Obviously, the Mississippi legislature must have had this in mind when they choose to copy this portion of the MRFRA verbatim from the federal RFRA. The Supreme Court has spoken on this issue. RFRA authorizes a money damages award against the government, and the district court offered no reason why the same wouldn't be true under MRFRA.

Second, plaintiff argues that a claim under the MRFRA is procedurally and independently brought under the MRFRA's own waiver of sovereign immunity clause, and accordingly the Mississippi Tort

Claims Act ("MTCA") is simply inapplicable under the text of the statutes.

The MTCA is codified in Chapter 46 of Title 11 of the Mississippi Code, specifically at Miss. Code Ann. § 11-46-1 *et seq.* Mississippi has not generally waived its sovereign immunity against claims by its own citizens, *see* Miss. Code Ann. § 11-46-3, and instead those claims must ordinarily be brought within the context of the MTCA, specifically those procedures set out in Section 11-46-15 of the MTCA. *See* Miss. Code Ann. § 11-46-5(1).

But the text of the MTCA makes clear that the procedures set forth in the act only apply to those "actions" which are "subject to and brought under the provisions of this chapter." *See, e.g.*, Miss. Code Ann. §§ 11-46-11(3)(a) (concerning statute of limitations) *and* 11-46-15(1) (concerning limits of liability). When the Mississippi legislature enacted the MRFRA, it chose to do so by including a separate and independent waiver of sovereign immunity and civil-action clause:

> A person whose religious exercise has been burdened in violation of this section ***may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against the government***, as defined by subsection (4) of this section. Standing to assert a claim or defense under this section shall be the same as the general

rules of standing under Article III of the United States Constitution.

Miss. Code Ann. § 1-61-1(6) (emphasis added).  The text of the MRFRA makes no mention of the MTCA, doesn't incorporate any provisions of the MTCA, and is codified in a completely different chapter of the Mississippi Code than the MTCA.  The MTCA, in contrast, only compels adherence to its procedural rules for those "actions" which are "subject to and brought under the provisions of this chapter." *See, e.g.*, Miss. Code Ann. §§ 11-46-11(3)(a) *and* 11-46-15(1).  That excludes the MRFRA.

The district court's decision finding that Walters's MRFRA claim must have been brought pursuant to the MTCA is without any statutory or case law support.  The district court did cite to a 2009 Mississippi Supreme Court case (years before the Mississippi legislature enacted the MRFRA) standing for the proposition that a waiver of state sovereign immunity must be done unequivocally, ROA.232 (citing to *Tunica Cnty. V. Gray*, 13 So.3d 826, 829 (Miss. 2009)), but that's precisely what the legislature did in the MRFRA when it wrote "A person whose religious exercise has been burdened in violation of this section ***may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against the government*** . . . ."  Miss. Code

59

Ann. § 11-61-1(6) (emphasis added). The district court likewise held that Walters's claim wasn't brought timely under the MTCA, but again the text of the MTCA's statute of limitations makes it applicable only to those actions "brought under" the MTCA, *see* Miss. Code Ann. § 11-46-11(3)(a), which a claim under MRFRA is not.

Finally, the district court determined that Green's vaccination-or-lab-testing rule satisfied strict scrutiny. In the context of Rule 12(b)(6), that was error. First, given that the district court found Green's motivations in denying Walters an accommodation and, later, offering him the lab-testing alternative "smacks of religious bias," ROA.228, that alone should preclude a determination that Green's rule satisfied a compelling governmental interest (because religious discrimination isn't a compelling interest). This is bolstered by the fact that Green's department operated without vaccination for the first 18 months of the pandemic, and Green didn't require anyone else at the department to submit to weekly lab testing despite the fact that the proffered motivation for the policy was the surge in Delta-variant cases which, per U.S. health agencies, could infect and spread between both vaccinated and unvaccinated people.

Perhaps more importantly, Walters's allegations make clear that there were at least two less restrictive means of accomplishing Green's public safety goal: allowing Walters to abide by Green's pre-vaccination safety rules or permitting Walters to test using affordable or free over-the-counter FDA-approved testing kits. While a failure-to-accommodate claim under Title VII permits an employer to select which among several reasonable accommodations it chooses to offer, a claim under MRFRA (informed by federal RFRA jurisprudence) requires the government to choose the policy least restrictive to the citizen's religious exercise. That was not the case here.

**C.    The district court erred by dismissing Walters's claims under Rule 56 because material disputes pervade the record and because Walters appropriately requested leave to conduct basic discovery under Rule 56(d)**

Although the district court determined Walters's claims would fail under either Rule 12 or Rule 56, the district court often cited to evidence contained within the defendant's "Exhibit A" proffered in support of its motion for summary judgment, which was composed of the Board of Aldermen's findings of fact and the documents the Board appended to those findings. The district court also at times credited Walters's verified allegations as competent summary judgment. Ultimately the district

court dismissed all of Walters's claims for all the reasons discussed earlier in this brief. This was error in the Rule 56 context for three reasons: first, Walters's verified allegations compared with the Board of Aldermen's findings of fact create multiple, disputed issues of material fact; second, the Board's findings of fact are composed of almost entirely of unsworn, unsigned, undated, and out of court hearsay statements that were not admissible as submitted to the district court; and, third, even if the City was entitled to summary judgment based on the "record," Walters timely and properly requested time to complete specific and important discovery under Rule 56(d). Each issue is addressed in turn.

First, even fully crediting the Board's findings of fact and attached exhibits, there are key material disputes left in the case.

- Concerning disparate treatment: whether Green, Scanlon, or White influenced the Board of Aldermen's vote before or during its executive session. Whether the Board of Aldermen share Green's perspective that some religions, like Jehovah's Witnesses, deserved religious accommodation while others, like Pentacostal Christains, did not. Why Green didn't require vaccinated firefighters to submit to weekly lab testing at their own expense given that the Delta

variant could infect and spread among both vaccinated and unvaccinated people.  Why Green didn't allow Walters to use FDA approved over-the-counter test kits, or observe Green's prior safety protocols, as opposed to lab testing.  Why Green, Scanlon, and White told Walters that four local medical laboratories offered free testing when Walters confirmed they didn't.

- Concerning disparate impact: whether Green's "vaccination-or-testing" policy adversely impacted religious objectors, like Walters, but not non-objectors.

- Concerning reasonable accommodation: whether Green's "lab testing" rule was "reasonable" under the totality of circumstances given that Walters couldn't afford to comply with the rule. Assuming not, whether any reasonable accommodation existed that would not have caused the City of Byram a substantial, undue hardship in the overall context of the City's business.

These are classic and factual disputes in religious discrimination cases and, for the most part, boil down to why Green and Byram's other administrators acted in the way they did.  The Supreme Court in *Reeves* held that an interested witness's self-serving testimony shouldn't be

credited against the non-movant on summary judgment. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (so holding). This court has previously defined an "interested witness" as someone with a "direct and private interest in the matter at issue." *Simmons v. Pac. Bells, L.L.C.*, 787 Fed. Appx. 837, 840 (5th Cir. 2019), quoting *Black's Law Dictionary* (11th ed. 2019). To the extent that Green, Scanlon, White, and the Board of Aldermen were each decisionmakers in Walters's termination, they are necessarily interested in justifying their allegedly discriminatory actions.

Furthermore, when Walters filed his complaint in this case, he invoked both Title VII's anti-discrimination provisions under 42 U.S.C. § 2000e-2(a) (traditional "but for" causation) and also under § 2000e-2(m). *See* ROA.26-27. To the extent the district court found Green's comments to Walters were at least some direct evidence of discrimination, summary judgment isn't proper under at least § 2000e-2(m) as a matter of law. This is because, if a plaintiff proves a violation under § 2000e-2(m), and the employer demonstrates that it "would have taken the same action in the absence of the impermissible motivating factor," liability still attaches to the employer, albeit the court may only award limited relief

to the plaintiff. *See* 42 U.S.C. § 2000e-5(g)(2)(B); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 349 (2013); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94-95 (2003).

Next, the district court erred by considering the Board of Aldermen's findings of fact as competent summary judgment evidence in the first place. Under Rule 56(c), the district court recognized that evidence is only admissible on summary judgment if it would be admissible at trial. ROA.221. The Board of Aldermen's written findings would not be admissible at trial. The writing is unsigned, author unknown, personal knowledge unknown, undated, and is a collection of out of court hearsay statements and wrote conclusions. The writing would be inadmissible under the federal hearsay and personal-knowledge rules of evidence. The Board's findings of fact were the only summary judgment evidence proffered by the City. Without it, the City has no summary judgment argument.

Finally, even if none of the above were true, the fact remains that Walters was never permitted to engage in ***any*** discovery in the case because, after the City filed its dispositive motion, the district court entered an order staying all discovery pending resolution of the motion.

ROA.155.  For reasons that aren't entirely clear, the district court determined that "No party requested additional discovery under Rule 56(d)" and therefore "The motion is now fully briefed and ripe for a decision."  ROA.219.  That was incorrect.  Walters explicitly requested leave to take specific and outcome-determinative discovery (*see* further *supra*).

Although this Court has held summary judgment may be granted without any time to conduct discovery, Rule 56(d) allows the non-movant to request time to conduct discovery if, without it, he "cannot present facts essential to justify [his] opposition[.]"

That's exactly the case here.  Walters explicitly requested staying the City's summary judgment motion so that he could take specific discovery.  Quoting from plaintiff's opposition brief, ROA.185-186:

> To the extent the Court is inclined to resolve any of these factual disputes in defendant's favor, plaintiff asserts he deserves an adequate opportunity for discovery on these issues under Fed. R. Civ. P. 56(d).
>
> Specifically, plaintiff seeks to depose Chief Green, city attorney Scanlon, Mayor White, and at least one or more of the Alderman to more fully support plaintiff's verified allegations contained in his complaint; to undermine the alleged non-discriminatory reasons that City of Byram relied upon to terminate Robert Walters's employment as described in the "Board of Alderman's Findings of Fact" attached as

Exhibit A to defendant's motion for summary judgment; and to develop discovery for any other basis upon which the plaintiff is entitled to relief in this case.

Plaintiff likewise asks for a reasonable opportunity to propound written discovery on these matters, and for the opportunity to develop expert public health testimony regarding the existence of reasonable accommodations the City of Byram could have provided to Walters.

Walters, through his attorney, declared and signed under penalty of perjury that this assessment was true and correct to the best of his knowledge. ROA.186 (at n.40).

It's true that Walters didn't submit a separate motion for discovery under Rule 56(d), but courts in this circuit, including this Court, have held doing so is unnecessary. *See Ticknor v. Rouse's Enterprises, LLC*, 2 F.Supp.3d 882, 897 n.40 (E.D. La. 2014) ("Although plaintiffs did not submit a separate motion for a continuance under Rule 56(d), it is settled that because of the precautionary nature of the rule . . . technical, rigid scrutiny of a Rule 56(d) motion is inappropriate") (quotations omitted); *accord Littlejohn v. Shell Oil Co.*, 483 F.2d 1140, 1146 (5th Cir. 1973) ("It is true that this representation was not in affidavit form by plaintiff in person but we think that the written representation by his lawyer, an

officer of the court, is in the spirit of Rule 56(f) [now Rule 56(d)] under the circumstances").

When a non-movant timely and for specific reasons requests time to complete necessary discovery, a district court's denial of discovery and grant of summary judgment is reversible error. *Hinojosa v. Johnson*, 277 Fed.Appx. 370, 378 (5th Cir. 2008) ("Hinojosa, however, has been denied a full and fair opportunity to discover information essential to [his] opposition to summary judgment, and this limitation is reversible error") (quotations omitted).

Because Walters timely and properly requested specific and outcome-determinative discovery on all aspects of his claims, the district court erred when it determined the record was ripe for summary judgment.

## X.    Conclusion

For all these reasons, plaintiff-appellant Robert Walters respectfully asks this Court to reverse the district court's dismissal of his claims with prejudice under both Rule 12(b)(6) and Rule 56.

Respectfully submitted:

/s/ Kevin S. Vogeltanz
Kevin S. Vogeltanz (Bar #32746)
Law Office of Kevin S. Vogeltanz, LLC
428 W. 21st Ave. / Covington, LA 70433
Office: (504) 275-5149
Fax: (504) 910-1704
Email: vogeltanz@gmail.com

*Attorney for Appellant Robert Walters*

## Certificate of Service

Pursuant to Fed. R. App. P. 25 and Fifth Circuit Rule 25.2.5, I, Kevin S. Vogeltanz, certify that on July 21, 2025 I filed appellant's original brief via the Court's CM/ECF system. To the best of my knowledge, all parties in this case are represented by attorneys who are registered Filing Users in this case and who will receive notice through the Court's CM/ECF system.

/s/ Kevin S. Vogeltanz
Kevin S. Vogeltanz (Bar #32746)
Law Office of Kevin S. Vogeltanz, LLC
823 Carroll Street, Suite A
Mandeville, LA 70448
Office: (504) 275-5149
Fax: (504) 910-1704
Email: vogeltanz@gmail.com

*Attorney for Appellant Robert Walters*

## Certificate of Compliance

Pursuant to 5th Cir. R. 32.3, I hereby certify that this brief complies with the type-volume limitations of 5th Cir. R. 32.2 and Fed. R. App. P. 32(a)(7)(b) because: excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,997 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word for Mac, version 16.54, in Century Schoolbook font, with 14-point font for text, and with 12-point font for footnotes.

/s/ Kevin S. Vogeltanz
Kevin S. Vogeltanz (Bar #32746)
Appeal Counsel
Law Office of Kevin S. Vogeltanz, LLC
823 Carroll Street, Suite A
Mandeville, LA 70448
Office: (504) 275-5149
Fax: (504) 910-1704
Email: vogeltanz@gmail.com

*Attorney for Appellant Robert Walters*